Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche Manning | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4128 | **DATE** | 7/3/2002 |
| **CASE TITLE** | SEC vs. Householder | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Report and recommendation to the Hon. Blanche Manning recommending that the District Judge enter an order GRANTING the SEC's Motion for Preliminary Injunction as set forth in the proposed order attached as Exhibit B to the SEC's motion for preliminary injunction is submitted herewith. This Court further respectfully recommends that the SEC's strong showing at the preliminary injunction hearing warrants swift action, given that the Temporary Restraining Order is set to expire on July 8, 2002. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. Lorentzen v. Anderson Pest Control, 64 F.3d 327, 330 (7th Cir. 1995).

(11) ■ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 0 8 2002 | |
| | Notified counsel by telephone. | | date docketed | 17 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | 7/3/20026 | |
| | | | date mailed notice | |
| tw | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>　　　　Plaintiff,<br><br>v.<br><br>ROGER A. HOUSEHOLDER, et al.<br>　　　　Defendants. | Cause No. 02 C 4128<br><br>Judge Blanche M. Manning<br>Magistrate Judge Geraldine Soat Brown |

To:　The Honorable Blanche M. Manning
　　　United States District Court Judge

**DOCKETED**
**JUL 0 8 2002**

## REPORT AND RECOMMENDATION

Geraldine Soat Brown, United States Magistrate Judge:

The motion of the Securities and Exchange Commission ("SEC") for a preliminary injunction and other relief [Dkt # 15] was referred to this Court for report and recommendation. This Court heard one half-day of testimony from five witnesses called by the SEC and received exhibits. Defendant Roger Householder, after being advised of the difficulties of proceeding *pro se* on such an important matter, elected to represent himself. Householder produced no witnesses or exhibits, and did not cross-examine the SEC's witnesses. For the following reasons, this Court respectfully recommends that the SEC's motion for preliminary injunction be GRANTED.

## JURISDICTION

The SEC alleges, and Householder admits, that the District Court has jurisdiction pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77(v)(a)), Section 27 of the Exchange Act (15

1

/7

U.S.C. § 78aa) and Section 214 of the Advisers Act (15 U.S.C. § 80b-14). (Compl. ¶ 4; Answer ¶ 4.)

## PROCEDURAL HISTORY

On June 10, 2002, the SEC filed a Complaint seeking a temporary restraining order, preliminary and permanent injunctions, and other equitable relief. [Dkt # 1.] Also on June 10, the SEC filed an emergency motion for a temporary restraining order ("TRO") [Dkt # 3], which District Judge Manning entered on June 11 against Householder. [Dkt # 5.] The TRO ordered, *inter alia*, that Householder refrain from transferring any funds. The District Judge also granted an order requiring co-defendants Apex Capital Management Corp. ("Apex Capital") and Apex Limited Partnership ("Apex L.P.") to provide an accounting. On June 18, the SEC moved to extend the temporary restraining order. [Dkt # 7.] The acting emergency judge, District Judge James Holderman, extended the TRO until July 8, 2002, and granted Householder the use of $1000 for his household expenses and $2500 for retention of counsel. [Dkt # 8.] On June 28, 2002, the SEC filed the present motion for preliminary injunction. By agreement, status was set before this Court for July 1, 2002, at which time Householder appeared, as did counsel for the SEC and counsel for Apex Capital and Apex L.P. Counsel for the SEC advised the Court that Apex Capital and Apex L.P. were in the process of complying with the order entered by the District Judge, and that the SEC was not seeking a preliminary injunction as to those parties, rather, the SEC's request for a preliminary injunction was directed to Householder. Pursuant to Fed. R. Civ. P. 65(b), the hearing on the preliminary injunction motion was set for July 2, 2002.[1] As stated above, this Court heard testimony,

---

[1] Householder was advised of the difficulty of representing himself in such a proceeding. He stated that he was unable to obtain counsel because his proposed counsel wanted a $2500 retainer

2

received exhibits, and heard arguments on this matter on July 2, 2002.

## FINDINGS OF FACT

Based on the evidence admitted at the preliminary injunction hearing, including admissions by Householder in his Answer to the SEC's complaint, this Court finds as follows:

I. <u>Householder Accounting, Apex Capital, Apex L.P. and Capital Enhancement</u>

Householder is a resident of Park Ridge, Illinois, and a licensed certified public accountant in the state of Illinois. (Compl. ¶ 7.) From 1991 and through the filing of the Complaint, Householder provided accounting and tax advisory services through his firm, Householder Accounting, an Illinois corporation. (Compl. ¶ 10.) In his Answer, Householder denied that he provided investment advisory services through Householder Accounting. (Answer ¶ 7.) However, the evidence showed that a check in the amount of $70,000 given by investor Gloria Duday to Householder for the purpose of investing in Treasury notes was made out to "Householder Accounting Services." (Pl.'s Ex. 15.) Likewise, the letter sent by Householder to Duday confirming the purported purchase of U.S. Treasury notes with the $70,000 was written on Householder Accounting Services letterhead. (Pl.'s Ex. 16.) Similarly, correspondence from Householder to investor Joel Machak was sent on Householder Accounting Services letterhead. (Pl.'s Ex. 18.) Thus, the Court finds that Householder used Householder Accounting Services to provide investment advisory services.

---

by Friday [June 28, 2002], and that he could not get the banks to release funds in view of the TRO. When asked why he did not show the banks the order entered by Judge Holderman on June 20, 2002, permitting Householder $2500 to retain counsel, he replied that he only got the order on Friday morning [June 28, 2002]. He elected to proceed with the preliminary injunction hearing rather than to agree to an continuance of the TRO to allow him time to retain counsel.

Apex Capital is an Illinois corporation that registered with the SEC as an investment adviser on December 7, 2001. (Compl. ¶ 8.) Householder arranged for the formation of Apex Capital, as well serving as its Director of Operations and Accounting Director. (*Id.*; Pl.'s Ex. 1.) He signed Apex Capital's annual report filed on February 5, 2002 with the Illinois Secretary of State, representing himself as the Secretary of Apex Capital. (Pl.'s Ex. 2.)

Although denied by Householder in his Answer, the evidence established that Apex L.P. is an Illinois limited partnership and hedge fund whose interests are being sold by Householder and Apex Capital. (Compl. ¶ 9; Pl.'s Ex. 8.) Apex Capital is the sole general partner of Apex L.P., and also serves as its investment adviser. (Pl.'s Ex. 8 at 1.) The objective of Apex L.P. is to provide investors with an opportunity to participate in Apex Capital's proprietary trading program. (*Id.*)

Aapex Advisors is an Illinois corporation that registered with the SEC as an investment advisor in December 1998. (Compl. ¶ 11.) The SEC alleges that Householder was the president of Aapex Advisors and was also one of its directors responsible for making its investment decisions. (*Id.*) Householder's Answer denies the latter allegation because "Aapex has not been in business for three years." (Answer ¶ 11.)

The SEC alleges that Householder organized Capital Enhancement LLC ("Capital Enhancement") in June, 1996, as an Illinois limited liability company (Compl. ¶ 26), and that the state of Illinois dissolved Capital Enhancement in November of 1997. (*Id.*) Householder's Answer states that he has "no knowledge sufficient to form a belief as to the truth of these allegations." (Answer ¶ 26.) However, the evidence showed that in December, 1999, Householder confirmed investor Joel Machak's investment of $430,000 in Capital Enhancement (Pl.'s Ex. 18), although the records of the Illinois Secretary of State show that Capital Enhancement was dissolved effective

November 28, 1997. (Pl.'s Ex.19.)

## II. Householder's Past Conduct

### A. The Capital Enhancement Investment Scheme.

The evidence, including testimony by investor Joel Machak, established that Householder told his clients that Capital Enhancement was an investment fund that would pool his clients' investments to trade securities. Householder advised Machak to invest $430,000–Machak's pension and profit sharing rollover, effectively his life savings–in Capital Enhancement, and falsely confirmed to Machak in December, 1999, that the funds had been invested in Capital Enhancement and had achieved earnings of $21,822. (Pl.'s Ex. 18.) In fact, Capital Enhancement had already been dissolved. (Pl.'s Ex. 19.) The SEC's examination of Householder's records including bank records disclosed that the funds provided by Machak to Capital Enhancement were, in fact, diverted to various bagel companies (Glass City Bagels and Heartland Bagels) in which Householder had an interest, to Householder personally, to Householder Accounting Services, and to the Park Ridge Presbyterian Church. (Pl.'s Exs. 27 and 28.)

Gloria Duday also testified at the hearing. She is now 72 years old and retired. Householder had prepared her income tax returns for fifteen years. In 1998, she discussed with Householder several IRA accounts that she had totaling approximately $33,000. She told Householder that she wanted them consolidated in a conservative and safe investment but with a little more return than they were then generating. He recommended Capital Enhancement, and in September and December 1998, she allowed Householder to transfer the money from the IRAs to Capital Enhancement. She

5

testified that she relied upon Householder in selecting the investment.[2] The SEC's examination of Householder's records including bank records disclosed that the funds provided by Duday to Capital Enhancement had, in fact, been diverted to Heartland Bagels, to Householder personally, and to Householder Accounting Services. (Pl.'s Exs. 25 and 26.)

The SEC alleges that between October 1997 and January 1999, Householder offered and sold more than $1.22 million in interests in Capital Enhancement to fourteen advisory clients (Compl. ¶¶ 27-28), and that eleven of these fourteen investors, including Joel Machak and Gloria Duday, followed Householder's suggestion to invest their retirement plan money in Capital Enhancement. (*Id.* ¶ 29.) Householder's Answer merely states again that he lacks knowledge sufficient to form a belief as to the truth of the allegations. (Answer ¶¶ 27-29.)

The Court finds that Householder misrepresented the existence of Capital Enhancement, the use of the proceeds, the safety of the investment, and the value of his clients' interests in Capital enhancement through false oral and written statements and account statements.

B. The Purchase of Treasury Bills for an Advisory Client.

In 1999, Duday expressed a desire to invest in U.S. Treasury notes. One day in May, 1999, Householder called Duday and told her that he had a "very good deal," that he had purchased Treasury notes for her through Householder Accounting, but that he needed to replace the funds by the next day. On Householder's direction, Duday wrote a check for $70,000–the amount in her

---

[2] Pesach Glaser, an SEC accountant who examined Householder's records and bank records, testified as to how the funds were transferred. Investors like Duday and Machak provided the funds to Independent Trust Corp. ("Intrust"), and signed forms directing Intrust to use the funds to invest in Capital Enhancement, LLC. *See, e.g.,* Pl.'s Ex. 14. Householder then had the funds transferred to a bank account or accounts in the name of Capital Enhancement over which Householder had signatory authority, and disbursed the funds for his own purposes.

savings account–payable to Householder Accounting as payment for the Treasury notes. (Pl.'s Ex. 15.) On May 28, 1999, Householder wrote to Duday confirming that he had purchased $70,000 of U.S. Treasury notes with an interest yield of 5.92%. (Pl.'s Ex. 16.) In fact, as Householder admitted in his bankruptcy proceedings, he deposited Duday's check into the Householder Accounting account, and used the money to pay himself, one of his bagel companies, and to make an interest payment to another investor. (Pl.'s Ex. 30 at 48-50.) No Treasury notes were ever bought by Householder for Duday. Duday is a creditor in Householder's bankruptcy proceeding.

III.  Householder's Ongoing Conduct: The Offer and Sale of Interests in Apex L.P.

On December 7, 2001, Apex Capital was registered as an investment adviser with the SEC. On its Form ADV (which is the form used to register with the SEC), Householder was listed as Apex Capital's "Accounting Director." (Pl.'s Ex. 7 at 3.) In a May 20, 2002 letter to investor Paul Levy, who testified at the hearing, Householder identified himself as "Director of Operations" of Apex Capital. (Pl.'s Ex. 9.) As discussed above, Apex Capital is the general partner of Apex L.P. Stanton Nelson, an SEC Senior Accountant who testified at the hearing, stated that he had acquired the subscription agreements for four Apex L.P. investors. Householder told Nelson that, of those four investments, he had sold one to investor Horberg. Horberg's partnership interest was $150,000.

The Confidential Private Offering Memorandum for Apex L.P. that was provided to potential investors listed Householder as one of the principals of Apex Capital, and purported to detail his qualifications and background. (Pl.'s Ex. 8 at 8.) The offering memorandum did not reveal that in October, 2000, the state of Illinois had issued an Order of Prohibition against Householder, which concluded that Householder had violated Illinois securities laws and permanently prohibited him from offering or selling any securities in or from the state of Illinois or from rendering investment

7

advice for a fee. (Pl.'s Ex. 4.)

Apex Capital and Householder also concealed Householder's prior disciplinary history from the SEC and potential investors in the ADV form filed on December 7, 2001. Item 11.D of the Form ADV required Apex Capital to disclose whether any state regulatory agency had ever found the adviser or "any advisory affiliate" to have violated an investment-related regulation or statute, or had ever entered an order against the adviser or any advisory affiliate in connection with an investment-related activity. (Pl.'s Ex. 7 at 15.) An "advisory affiliate" is defined broadly to include employees, officers, directors, and "all persons directly or indirectly controlling you or controlled by you," (*Id.* at 13), clearly including Householder. Apex Capital answered "No" to these questions. (*Id.* at 14.)

Paul Levy, an Apex L.P. investor who testified at the hearing, stated that he was never told of Householder's prior disciplinary history with the state of Illinois. He testified that he received the Apex L.P. Private Placement Offering Memorandum and read it. Levy further testified that, had he known of Householder's history, he would not have invested, as he did, a total of $450,000 in Apex L.P. on behalf of himself, family members and a pension plan fund whose beneficiaries are the employees of the company sponsoring the plan.

The Court finds that the failure to disclose the Order of Prohibition against Householder was an omission of material fact that made Apex Capital's applications for investment advisor registration and the Private Offering Memorandum for Apex L. P. materially misleading.

## CONCLUSIONS OF LAW

### STANDARDS FOR GRANTING A PRELIMINARY INJUNCTION

A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. If the court is

> satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. Finally, the court must consider the public interest (non-parties) in denying or granting the injunction. . . . This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position.

*Ty, Inc. v. Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001) (citations omitted).

I. The SEC has Shown a Likelihood of Success on the Merits.

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d), entitle the Commission to seek injunctive relief provided that "a proper showing" is made. A "proper showing" is made when the SEC demonstrates a "justifiable basis for believing, derived from reasonable inquiry and other credible information, that such a state of facts probably existed as reasonbly would lead the SEC to believe that the defendants were engaged in violations of the statutes involved." *SEC v. General Refractories Co.*, 400 F.Supp. 1248, 1254 (D.D.C. 1975). Where the SEC presents a prima facie case that the defendant has violated the law, a proper showing has been made. *See SEC v. The Fundpack, Inc.*, 1979 WL 1238 at *5 (D.D.C. 1979). Once the SEC shows a probable violation of the law, it need only show that there is a reasonable likelihood of a future violation in order to obtain relief. *See SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982).

The SEC has made a very strong showing both that Householder knowingly violated securities laws and that he is likely to continue this pattern of deceptive behavior if not enjoined from doing so. As such, the SEC has adequately shown the likelihood of success on the merits for the purpose of obtaining injunctive relief.

A.  The SEC has Made a Showing that Householder Violated The Law.

1.  Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.

First, the SEC argues that Householder violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Both Sections prohibit any person in the offer or sale of securities from (1) employing any scheme or artifice to defraud; (2) making any untrue statement or omitting any material fact necessary to make the statements, in light of the circumstances in which they were made, not misleading; or (3) engaging in any act, practice or course of business that operates as a fraud or deceit upon any person.

A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Although scienter is not required to prove violations of Section 17(a)(2) and 17(a)(3) of the Securities Act, the SEC must establish scienter to prove violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5. *See Aaron v. SEC*, 446 U.S. 680, 690-97 (1980). Recklessness satisfies this scienter requirement. *See SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985). A company's scienter can be imputed to the individuals controlling it. *See SEC v. Manor Nursing Ctrs., Inc.* 458 F.2d 1082, 1089, n.3, 1097, n.18 (2d Cir. 1972).

As set out above, the Court finds that the SEC has made a very strong showing that Householder violated the law by making material misrepresentations and omissions of material fact when offering and recommending investments. The testimony of the investors Joel Machak, Gloria Duday and Paul Levy, who relied on Householder's advice, demonstrated that the misrepresentations of fact and omissions of fact were material. For example, Paul Levy testified that he would not have

10

invested $450,000 in Apex L.P. had the offering memorandum disclosed that the state of Illinois had prohibited Householder from offering such investments.

The SEC also sufficiently demonstrated scienter in Householder's conduct. For example, Householder knew his own disciplinary history and failed to disclose it in the offering documents provided to investors in Apex L.P. and in Apex Capital's application for registration as an investment advisor. In light of the proof of Householder's involvement with Apex Capital, the scienter of Apex Capital is appropriately attributed to him. Further, scienter is shown by Householder's founding of Apex Capital and his involvement with the Apex L.P. offering despite the fact that the state of Illinois had barred him from acting as an investment adviser or offering or selling securities in Illinois. Householder's conduct with respect to the investments of Machak and Duday also support a finding that the SEC has made a showing that it is likely to succeed in proving the element of scienter where required.

2. Section 206 of the Investment Advisers Act.

Second, the SEC argues that Householder violated Sections 206(1), 206(2), 206(4), 15 U.S.C § 80b-6 (1), (2) and (4), and Rule 206(4)-4, 17 C.F.R. § 275.206(4)-4, of the Investment Advisers Act by making misrepresentations and omissions of material facts to advisory clients. Sections 206(1) and 206(2) are similar to, though broader than, Sections 17(a) of the Securities Act and Section 10(b) of the Exchange Act, as they prohibit investment advisers from (1) using the mails or other instruments of interstate commerce to employ any device, scheme or artifice to defraud any client or prospective client; and (2) engaging in *any* transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 198-99 (1963). This broadness reflects the fiduciary nature

11

of the relationship between the investment adviser and client and imposes upon all investment advisers "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading his clients." *SEC v. Blavin*, 760 F.2d 706, 711-12 (6th Cir. 1986).

Section 206(4) of the Investment Advisers Act prohibits an investment adviser from engaging in any act, practice, or course of business, which is fraudulent, deceptive or manipulative as defined by the rules and regulations promulgated by the SEC. Rule 206(4)-4 provides that it is a fraudulent, deceptive or manipulative act when an adviser fails to disclose all material facts with respect to a legal or disciplinary event involving a management person of the adviser, if such an event is material to an evaluation of the adviser's integrity. 17 C.F.R. § 275.206(4)-4. Householder fits the definition of a "management person" under the rule, in that he exercised a controlling influence as Director of Operations over Apex Capital, which was the sole general partner and investment adviser of Apex L.P. Further, Rule 206(4)-4 provides that an order entered in an administrative proceeding brought by a state agency, such as the Illinois Securities Department's Order of Prohibition, is presumptively material. *See* 17 C.F.R. § 275.206(4)-4.

Scienter is required to prove a violation of Section 206(1), but not Sections 206(2), 206(4) and Rule 206(4)-4. *See Capital Gains Research Bur.*, 375 U.S. at 195; *SEC V. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992). Recklessness satisfies the requirement of scienter under Section 206(1) of the Investment Advisers Act. *See Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1126 (7th Cir. 1990); *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 792 (7th Cir. 1977).

As in the analysis of the showing made for violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the SEC has made a strong

showing both that Householder engaged in fraudulent, deceptive or manipulative acts and that he acted with the requisite scienter. Householder deceived Duday and Machak into making investments that provided him access to their funds and completed the fraud by misappropriating those funds. Householder failed to disclose to prospective Apex L.P. investors that the State of Illinois had prohibited him from offering investment advice. This information is presumptively material under Rule 206(4)-4 and would have been extremely important to investors in Apex L.P. Householder should have known, and almost certainly did know, the grave importance of this information and the omission of the facts from the offering memorandum and his own advice sufficiently demonstrates scienter.

3. Section 207 of the Investment Advisers Act.

Finally, the SEC has shown that Householder likely violated Section 207 of the Advisers Act, which makes it unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the SEC under section 203 or 204 of the Advisers Act, or willfully to omit to state in any such application or report any material fact which is required to be stated. As discussed above, Item 11.D of Form ADV that Apex Capital filed on December 7, 2001, specifically asked whether any state regulatory agency had ever found the adviser or "advisory affiliate" to have violated an investment-related statute or regulation, or ever had entered an order against the adviser or advisory affiliate.

Even though the state of Illinois entered its Order of Prohibition against Householder in October 2000, in December 2001, Apex Capital answered "No" to Item 11.D, thereby omitting to state that its principal, Director of Operations, and Accounting Director was prohibited from offering investment advice or securities. This untrue statement of a material fact demonstrates that

13

Householder violated Section 207 of the Advisers Act.

B.  The Likelihood of Future Violations.

In assessing the likelihood of a future violation, the court should consider (1) the gravity of harm caused by the offense; (2) the extent of the defendants' participation; (3) the defendants' degree of scienter; (4) the recurrent nature of the infraction; (5) the likelihood that defendants' customary business activities might again involve them in such transactions; (6) defendants' recognition of their own culpability; and (7) the sincerity of assurances against future violations. *See SEC v. Suter*, 732 F.2d 1294, 1301 (7th Cir. 1984) (quoting *Holschuh*, 694 F.2d at 144). Here, consideration of these factors supports the need for injunctive relief. First, the gravity of the harm is extreme. Machak and Duday both testified that Householder's misrepresentations regarding Capital Enhancement cost them their life savings. Further, Levy testified that he would not have invested $450,000 with Apex L.P. had Householder disclosed his prior disciplinary history. Second, there is no doubt that Householder, Apex Capital and Apex L.P. were directly involved in these violations. Third, as discussed above, Householder acted with scienter. Fourth and fifth, evidence at the hearing indicated that Householder has a history of multiple instances of providing false and misleading investment information to his clients, and that his customary business activities might involve him in such transactions in the future. He misappropriated Machak and Duday's life savings for his own use after telling them that he was putting their money in a safe and profitable investment product. He did not disclose to prospective Apex L.P. investors that the state of Illinois had prohibited him from offering securities or providing investment advice. He incorporated Apex Capital and acted as its Director of Operations and Accounting Director despite the state of Illinois' proscription of such employment. Householder did not resign from his position of Director of Operations at Apex

14

Capital until June 6, 2002. Finally, there is no indication that Householder has either recognized his culpability or that he has offered any assurances, sincere or otherwise, that he will not commit any future violations. It is therefore sufficiently likely that Householder will continue to engage in these violations of the law if he is not enjoined from doing so.

II.   No Adequate Remedy at Law Exists.

In its motion, the SEC seeks to enjoin Householder from engaging in any securities offerings or investment advising activity, and also seeks to freeze his assets. The SEC ultimately seeks the equitable remedy of disgorgement, which if granted would require Householder to disgorge ill-gotten gains from the securities violations. Disgorgement is an appropriate remedy for violations of federal securities laws. *See SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974). The SEC is also seeking an accounting, which will allow it to determine more accurately the scope of the violations, the disposition of investor funds, and ensure the proper distribution of the assets. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105-06 (2d Cir. 1972). Householder has not presented any argument that the SEC has an adequate remedy at law.

III.   Irreparable Harm Will Result in the Absence of Injunctive Relief.

The SEC has amply demonstrated that irreparable harm will result if Householder is not enjoined from engaging in further securities violations and if his assets are not frozen. Federal courts have the power to freeze a defendant's assets to ensure that the defendants will not secrete or dissipate any assets within their control pending the entry of a final order. *See SEC v. Vaskevitch*, 657 F.Supp. 312, 315 (S.D.N.Y. 1987). Such a freeze of assets ensures that the remedies of disgorgement and accounting are meaningful, and to ensure that investors recover some of their

monies. *See, e.g., International Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974). Here, the evidence demonstrated a pattern of Householder's misappropriating his clients' funds for his own purposes. Thus, there is a substantial risk that he will dissipate any funds that become available to him unless he is enjoined from doing so. In order for Machak, Duday, Levy and other investors to recover some portion of their investments, this Court respectfully recommends that the preliminary injunction requested by the SEC be entered to freeze Householder's assets to prevent irreparable harm.

## IV. Balancing the Harms on a Sliding Scale.

It is also necessary to consider the irreparable harm that may result to Householder if a preliminary injunction is granted, and to balance that consideration against the showing of irreparable injury made by the movant, taking into consideration the strength of the SEC's showing of its likelihood of success on the merits. *See Ty, Inc.*, 237 F.3d at 895. As noted above, Householder declined to present any evidence at the hearing on the preliminary injunction motion. The only indication of harm that Householder provided was a suggestion in argument that he needed money to pay his mortgage and to retain counsel.[3] Householder did not provide any evidence to show what his mortgage payments involved or that his wife's income might be inadequate to meet that need. Based on Householder's failure to produce any evidence of harm and in light of the foregoing findings of fact and conclusions of law, this Court finds that the SEC's demonstrated need for the injunctive relief and its strong showing of likelihood of success on the merits of the case far outweigh Householder's concerns.

---

[3] As noted above, Householder apparently did not take advantage of Judge Holderman's order extending the temporary restraining order, which allowed Householder to obtain $1000 for his expenses and $2500 for retention of counsel.

16

## V. Harm to the Public.

The public has numerous important interests in this lawsuit. If Householder is permitted to continue providing investment advice and offering securities, more people could see their life savings misappropriated and dissipated. The public has an interest in the effective enforcement of federal securities laws. Householder has already shown his disdain for the state of Illinois' prohibition of his engagement in offering securities and investment advice, and it is likely that the public will not be protected from his activities in the absence of injunctive relief. Householder has not advanced any argument or evidence to prove that any harm to the public will result from an award or injunctive relief, much less whether that harm is outweighed by the public interest in such injunctive relief. Accordingly, the public interest weighs in favor of the issuance of an injunction.

## CONCLUSION

For the foregoing reasons, this Court finds that the SEC made a strong showing that (1) Householder has repeatedly committed material violations of securities laws; (2) Householder will likely continue to violate the law in the absence of injunctive relief; and (3) irreparable harm will result if Householder is permitted to continue providing investment advice and offering securities or to dissipate his assets. Accordingly, this Court respectfully recommends that the District Judge enter an order GRANTING the SEC's Motion for Preliminary Injunction [Dkt # 15] awarding the relief sought by the SEC as set forth in its proposed order attached as Exhibit B to the SEC's motion for preliminary injunction. This Court further respectfully recommends that the SEC's strong showing at the preliminary injunction hearing warrants swift action, given that the Temporary Restraining Order is set to expire on July 8, 2002.

Specific written objections to this report and recommendation may be served and filed within

10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

**ENTER:**

*[signature]*
Geraldine Soat Brown
**United States Magistrate Judge**

**Dated: July 3, 2002**